WILLIAM MULVANEY, Appellee, v. JOHN BUCKLEY et al., Appellants.

**FRAUDULENT CONVEYANCES:** Remedy of Creditor—Burden of Proof. A grantor's conveyance in fraud of creditors may not be set aside as to a grantee for value on testimony justifying a *suspicion* that the grantee participated in the grantor's fraud. The creditor must show that the grantee had actual or constructive notice of said fraud. Evidence held insufficient to meet the rule.

*Appeal from Cherokee District Court.*—WILLIAM HUTCHINSON, Judge.

FEBRUARY 15, 1921.

AN action to set aside the conveyance of certain real property, and to subject the same to execution. Decree in the court below, as prayed. Defendant appeals.—*Reversed.*

*J. A. Miller* and *Herrick & Herrick,* for appellant.

*William Mulvaney* and *Claud M. Smith,* for appellee.

STEVENS, J.—I. Plaintiff brings this action, as the judgment creditor of Daniel Buckley, to set aside a deed conveying Lot 2 of Block B of Lot 2 in the south half of Section 2, Township 90, Range 41, consisting of about 94 acres, and also Lots 7 and 8 in the incorporated town of Quimby, all in Cherokee County, Iowa, to his brother John Buckley, alleging in his petition that same was executed without consideration and in fraud of creditors. The consideration expressed in the deed conveying the farm land, which was executed December 12, 1911, is $3,700, and that in the deed conveying the town property, which was executed March 23, 1912, was $675.

The principal contentions of counsel for appellant are that the court was without jurisdiction to enter judgment against the defendant, for want of legal notice upon Daniel; that the transfers were for a valid consideration; and that the evidence wholly fails to show that same were executed in fraud of creditors, and that plaintiff did not become the creditor of Daniel Buckley until after the conveyances complained of were executed. The return of the sheriff upon the original notice offered in evidence shows that it was received by the sheriff on the 27th of April, 1912, and that on the same day it was served upon the defendant by leaving a copy at the home of John Buckley, a member of defendant's family over 14 years of age. So far as disclosed by the record, the last time Daniel Buckley was seen in Cherokee County was at Washta, on April 9th, and the next time he was heard from, he was in Ireland. Just when he ceased to be a resident of Cherokee County, or to reside with the defendant John Buckley, is not shown; but, in view of the conclusion reached upon the merits, we need not determine whether the judgment in question is subject to collateral attack, because entered without jurisdiction.

II. Daniel, John, and Jerry Buckley, three bachelor brothers, resided in Cherokee County for a good many years, except that Jerry, for a part of the time, was a resident of Oregon, but made frequent trips to Cherokee. On November 30, 1911, Daniel was arrested upon a charge of an assault with intent to murder one Eb Hull. The plaintiff, an attorney at law at Cherokee, was employed on the same day to defend him. The defendant waived preliminary examination, and was bound over to the

grand jury upon a bond in the sum of $10,000; and later, an indictment was returned, and the defendant was released upon a bond of $5,000. Both of these bonds were signed by John Buckley, as surety. Daniel Buckley, after a trial, was acquitted by the jury, on the 27th or 28th of March, 1912. Concerning the purchase of the 94-acre tract and the Quimby residence property, the defendant testified that he purchased the former tract November 9, 1911, paying his brother $100, and giving him a note for $3,600, due March 1, 1912, and that the deed was executed as soon as he was able, on account of illness, to go to town, and was filed for record. He also testified that he purchased the town property in the latter part of March, and paid Daniel $675 by check at the time he made final settlement for the farm, on or about April 1, 1912. The defendant testified that he gave Daniel $100 cash, and that the note for $3,600 he destroyed. It may be fairly inferred from the testimony that Daniel made his home with the defendant from some time in November until he left Cherokee County, to go to Ireland. The only direct evidence tending to show that the conveyance of the farm by Daniel to the defendant was not in good faith is a conversation, in plaintiff's presence, between Daniel and defendant, during which Daniel declared that the purpose of the deed to the farm was to prevent Eb Hull from enforcing a claim for damages. Plaintiff testified:

"John said to Dan, 'Daniel, I won't sign your bond, and I will let you go to the pen.' And Dan asked him why, and he said that 'I signed one bond for you for $10,000, and I'm not going to sign any more bonds.' And they talked back and forth on those lines, and Dan apparently grew very angry and began to swear, and he said to John: 'You think that—you pretend that you did great things, but you did nothing at all; you didn't even go on my bond. You know why I deeded you that land, and you know you haven't a dollar in it—not a dollar. You know that that is mine, and you never paid up one dollar, and I deeded you that land to secure you on the bond business, and in the event that Eb Hull got any claim against you, that he could not get it, and you know you haven't a dollar of it, not a dollar.' And Jack didn't say anything. And Dan kept on

roasting John on that kind of lines, and finally John signed the bond without saying any more,—didn't say aye, yes, or not to that.''

This conversation, which is denied by defendant, occurred on the day the second bond was signed. It further appears from the record that, some time in 1909, Daniel conveyed the 94-acre farm to his brother Jerry, who at that time was a resident of Oregon, for an expressed consideration of $4,500. This farm was reconveyed to Daniel in 1910, for an expressed consideration of $4,500.

Jerry Buckley, examined as a witness on behalf of the defendant, testified that Daniel was still indebted to him for a part of the purchase price, and that same was paid to him out of proceeds of the sale to the defendant. The record discloses that, on the day the money was paid by the defendant to Daniel, in the Cherokee State Bank, a draft was issued by the bank to Jerry, at the request of Daniel, for $3,662, and that later, on the same day, the draft was exchanged for a certificate of deposit for $3,000, the balance evidently having been paid in cash. This certificate of deposit, indorsed by both Jerry and Daniel, was turned over to the Washta State Bank on April 9th, and a draft, drawn on the United Bank of Cork, Ireland, for £800, for which Daniel paid $3,905, was issued to him. At the same time, he purchased a steamship ticket to Ireland. Jerry, however, testified that no part of the proceeds of the draft for $3,662 issued to him by the Cherokee State Bank was paid or delivered to Daniel. The record, as indicated, however, conclusively establishes the falsity of this testimony. Furthermore, the evidence fairly shows that the transfer by Daniel to Jerry was without consideration; that the deed was recorded, but not delivered; and that the purpose of the reconveyance was merely to restore the legal title to Daniel. In so far, therefore, as the testimony of Jerry Buckley formally tends to corroborate the testimony of the defendant, it has little or no probative value. We may assume from the evidence of these facts that Daniel was seeking to cover up the proceeds of the sale of the property to his brother, to prevent the same from falling into the hands of creditors. At the time of these transactions, an original notice in an action commenced by Eb Hull against Daniel, claiming

damages on account of the alleged assault, had been served upon him, and petition filed. While there is some dispute as to the fair value of these respective properties, we think the evidence fairly shows that the price paid for the farm was substantially its value, and that the price paid for the town property was perhaps somewhat less than the market value. The defendant later sold it for $2,400, but he testified that improvements costing $500 or $600 were placed thereon by him; and probably the property had advanced to some extent in value.

So far as disclosed by the record, the only creditors of Daniel Buckley were the plaintiff and Eb Hull. Hull later obtained judgment by default for $2,500. Daniel was not insolvent at the time the conveyances were made. If we accept the testimony of the defendant, that he purchased the 94-acre tract on November 9th, then it necessarily follows that the conveyance of December 12th was not executed in fraud of creditors, but for the purpose of passing the legal title to the defendant, as a purchaser for value. According to the testimony of plaintiff, touching the conversation between the defendant and Daniel at the time of the execution of the $5,000 bond, in which Daniel declared the conveyance to have been without consideration, and to keep Hull from enforcing a claim for damages against the property, the transaction was not in good faith. No effort was, however, made by Daniel to dispose of the Quimby property until after he was acquitted of the charge of assault with intent to commit murder, nor was any effort made to conceal the fact of the conveyance of the farm land to defendant, as the deed was promptly placed of record. In addition to showing that Daniel Buckley conveyed his property for the purpose of defrauding his creditors, the burden rested upon the plaintiff to show that the defendant, at the time of purchasing same, even though for value, knew of such intention, or had knowledge of such facts as should have put him upon inquiry. Whether or not plaintiff and Daniel Buckley had agreed upon the amount to be paid for the services rendered, is not shown. The defendant denied that he knew that Daniel was indebted to the plaintiff, but we think that we may fairly infer from the testimony that he must have known that Daniel owed plaintiff at the close of the trial. There is no evidence, except that quoted

above, which in any way tends directly to connect the defendant with any fraudulent purpose or attempt upon the part of Daniel Buckley to dispose of his property for the purpose of cheating his creditors. He emphatically denies that he knew of the alleged fraudulent purpose of Daniel to dispose of his property in fraud of creditors. It is true that the three brothers were very close to each other, as claimed by counsel for appellee, and, as stated, Daniel had previously conveyed his farm to Jerry for an apparently fraudulent purpose, and the arrangement between them to make it appear that he was indebted to Jerry must have been for the purpose of covering up the money, and to enable him to get away with it. The evidence does not, on the other hand, show that the defendant participated in any way in any of these transactions. To justify a decree setting aside a conveyance for value, something further must be shown than facts justifying a suspicion: it must be shown that the purchaser had actual or constructive notice of the fraudulent purpose of the grantor. *Jones v. Hetherington,* 45 Iowa 681; *Farmers & M. Bank v. Daiker,* 166 Iowa 728; *Ford v. Ott,* 182 Iowa 671, 679. The defendant knew that Daniel had been arrested, and that plaintiff defended him, and we may assume that he also knew that the suit had been commenced by Eb Hull for damages.

Does the record before us show that such facts were known to the defendant as to charge him with constructive notice of the fraudulent intention upon the part of Daniel Buckley to convey away his property for the purpose of cheating and defrauding his creditors? Aside from the admitted facts, there is nothing to show such knowledge, except the declarations of Daniel to the defendant at the time the $5,000 bond was signed, to which the defendant made no reply. If the conveyances were made without consideration, and for the purpose stated by Daniel, a different arrangement was later entered into; because the evidence shows conclusively that the money turned over by the defendant to Daniel was a part of the proceeds of a $10,000 loan, which he transferred to the bank at a discount, for the purpose of raising the funds with which to pay for the land. Of course, if, at the time the deed was executed to the defendant, it was done for the purpose of placing Daniel's property beyond

the reach of Hull, in case the latter obtained judgment against Daniel for damages, the fact that a later arrangement was entered into, by which the defendant paid value for the land, would make no difference. He would not, under such circumstances, be a purchaser without notice, for value. Daniel had been talking for some time to his brother, according to their testimony, about going to Ireland. He appears to have departed without informing the defendant of his intention to do so, or bidding him goodby. Apparently, he never wrote his brothers, after arriving in Ireland. He died some years later, and an administrator was appointed in Cherokee County. The plaintiff filed his claim, based upon the judgment and the services rendered; and same was allowed by the administrator, and later approved by the court. The testimony of the defendant that he paid Daniel $100 and gave him a note for $3,600 on the 9th of November is not disputed, and doubtless could not have been controverted by a living witness. Jerry undertook to corroborate the defendant's testimony by saying that Daniel wrote a letter to him at Portland in November, saying that he had sold the farm to John; but, in view of the character of Jerry's testimony on other matters, we are not inclined to give much credit to the claimed receipt of a letter by him from Daniel. Just what will amount to constructive notice to a purchaser from a fraudulent grantor, so as to justify the setting aside of the conveyance and subjecting the property to execution, is not capable of precise statement. Each case must stand upon its own peculiar facts. Notwithstanding the holding of the trial court, we are unable to reach the conclusion that the evidence justifies the setting aside of the deeds and subjecting the property to the lien of plaintiff's judgment. This result enables Daniel Buckley to perpetrate a great injustice upon the plaintiff; but a different conclusion, in our opinion, would result in a similar injustice to the defendant. It follows that the judgment and decree of the court below must be and are—*Reversed.*

EVANS, C. J., ARTHUR and DE GRAFF, JJ., concur.